**Affirmed and Opinion Filed January 25, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00644-CV

**ALBERT G. HILL, III, Appellant**

**V.**

**MARGARET KELIHER, IN HER CAPACITY AS PERSONAL REPRESENTATIVE AND SUCCESSOR INDEPENDENT EXECUTOR OF THE ESTATE OF ALBERT G. HILL, JR., AND CAROL E. IRWIN, IN HER CAPACITY AS PERSONAL REPRESENTATIVE AND INDEPENDENT EXECUTOR OF THE ESTATE OF IVAN IRWIN, JR., Appellees**

**On Appeal from the Probate Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. PR-19-02706-2**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Garcia
Opinion by Justice Myers

This is an appeal from an order and judgment granting the Texas Citizens Participation Act (TCPA) motions to dismiss filed by appellees Margaret Keliher, in her capacity as the personal representative and successor independent executor of the estate of Albert G. Hill, Jr., and Carol E. Irwin, in her capacity as personal representative and independent executor of the estate of Ivan Irwin, Jr. Appellant Albert G. Hill, III, brings three issues attacking the trial court's ruling. We affirm the trial court's order and final judgment.

## BACKGROUND AND PROCEDURAL HISTORY

## I. Introduction

This appeal traces its distant origins to a real estate transaction that occurred in July 2004. Ivan Irwin, Jr., as trustee of the Albert Hill Trust (the Trust), a trust established for the benefit of Hill III's father, Albert G. Hill, Jr (Hill Jr.), purchased from appellant Albert G. Hill, III (Hill III), an undivided 80 percent interest in a residence located on Bordeaux Avenue in Dallas, Texas (the Bordeaux property or residence). On July 1, 2004, the parties—Hill III and his wife as sellers, and Irwin, on behalf of the Trust, as buyer—signed a real estate sales contract. The following day, on July 2, the Trust paid Hill III and his wife $3.1 million for an undivided 80 percent interest in the Bordeaux property (the Bordeaux transaction). Hill III and his wife retained the remaining 20 percent interest in the property.

## II. The Indictments

Seven years later, in 2011, Hill III and his wife were indicted by a Dallas County grand jury on March 31, 2011, for allegedly making false and misleading written statements to OmniAmerican Bank. The charges related to a $500,000 home equity loan Hill III obtained from OmniAmerican in May of 2009, secured by the Bordeaux property. The case was brought to the attention of Dallas County District Attorney Craig Watkins's office (the D.A.) on February 22, 2010, by a memorandum submitted by Hill Jr.'s lawyer, Michael Lynn, that claimed Hill III and his wife made criminally false statements in their home equity loan documentation to obtain credit.

The following month, on March 12, 2010, Lynn arranged a meeting between Stephanie Martin, an assistant D.A. assigned to review the criminal complaint, and Hill Jr. According to Hill III's first amended complaint, during this meeting Hill Jr. and Lynn repeated and adopted false allegations that had been made against Hill III in the memorandum, and they pressured Martin to pursue a criminal prosecution of Hill III. One month later, on April 14, 2010, David Pickett, who had replaced Irwin as trustee of the Trust four days earlier, submitted a written memorandum like Lynn's to the Dallas D.A., which the D.A.'s office has lost and is not part of this record.

### III. "Spider Web of Litigation"

At the time of these events, Hill III and Hill Jr. were on opposing sides of protracted and highly contentious litigation in federal court. Hill III had been involved in litigation against his family—primarily Hill Jr., who died in 2017—since 2007. The lawsuits, collectively referred to as a "spider web of litigation," consisted of over twenty lawsuits and appeals involving Hill III, Hill Jr., other family members, lawyers, and others.[1]

One of those suits was brought in the U.S. District Court for the Northern District of Texas (the federal court), and it involved the management and beneficiaries of two trusts H.L. Hunt established in the names of his two eldest

---

[1] *See, e.g., Hill, Jr. v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 728 (Tex. 2018).

children, Margaret Hunt Hill and Haroldson Lafayette Hunt (the trust action). Margaret Hunt Hill, in turn, had three children, including Hill Jr.[2]

On February 18, 2010, four days before Lynn's memorandum, the federal court in the trust action—dealing with one thread of this massive litigation—entered an order finding Hill Jr. had submitted affidavits in opposition to a motion for partial summary judgment "in bad faith and with the intent of misleading the Court."[3] The court's order also stated that arguments advanced by Hill Jr. "far exceeded the bounds of advocacy, permissible or otherwise."[4]

On May 13, 2010, Hill III and numerous other parties entered into a global settlement and mutual release agreement (GSA), which the federal court incorporated into a November 2010 final judgment. The GSA and final judgment contain language disposing of the trust action and other specified litigation as well as "any and all past, present, or future claims, actions, causes of action, counts, counter-claims, cross-claims, and appeals . . . that were, or could have been, asserted in the Litigation . . . which any Agreeing Party has or may have, known or unknown, now existing or that might arise hereafter. . . ." As consideration, Hill III received

---

[2] *See Hill, III v. Schilling*, 593 F. App'x 330, 332 (5th Cir. 2014); *Hill, III v. Hunt, et al.*, No. 3:07-CV-2020-O, 2010 WL 11537520, at *3 (N.D. Tex. Feb. 18, 2010).

[3] *Hill, III v. Hunt, et al.*, 2010 WL 11537520, at *11.

[4] *Id*. at *15.

over $100 million.[5]  As the Court of Criminal Appeals stated in its opinion in the criminal case against Hill III, this "settlement represented a substantial financial victory for Hill [III]." *State v. Hill, III*, 499 S.W.3d 853, 856 (Tex. Crim. App. 2016).

## IV. The Lynn Memorandum

It was against a backdrop of highly contentious and protracted litigation between father and son that Lynn's February 22, 2010, memorandum was submitted to the chief of the specialized crime division of the Dallas County D.A.'s office.  The essence of Lynn's memorandum was that Hill III and his wife made false and misleading statements in their home equity loan documentation, mispresenting their ownership interest in the Bordeaux property to be 100 percent when they had a 20 percent interest—the other 80 percent being owned by the Trust.  OmniAmerican Bank did not complain of Hill's conduct.  The loan was fully collateralized, and it is undisputed that the loan was repaid prior to the March 2011 indictments of Hill III and his wife for the offenses of making a false statement to obtain property or credit and securing execution of a document by deception.[6]  The indictments against Hill

---

[5] The case continued to be litigated even after entry of final judgment.  For example, the Fifth Circuit affirmed the federal district court's order denying Hill III's motion to vacate the judgment in light of new evidence, terming the litigation "protracted, complicated, and, most importantly, settled with a Global Settlement and Mutual Release Agreement." *Hill, III v. Schilling*, 593 F. App'x at 331.  And more recently, in December of 2018, the federal district court held Hill III in contempt for violating the court's orders, sanctioned him, and it described Hill III's continued legal filings as "frivolous and vexatious." *Hill, III v. Schilling*, Civil Action No. 3:07-CV-02020-L, 2018 WL 6492508, at *9–11 (N.D. Tex. Dec. 10, 2018) (specifically threatening to impose sanctions against the offending attorney or party if they filed any further motions to "reconsider, amend or alter the [November 2010 final] judgment, or any similar motion seeking to vacate the November 2010 final judgment" that the court found to be "baseless, frivolous, or without merit.").

[6] *See* TEX. PENAL CODE §§ 32.32(b), 32.46(a).

–5–

III's wife were dismissed within six months after they were returned.

## V. The Motion to Quash and Dismiss

This is not the first time Hill III has been in our Court. As our prior opinions in the criminal case against him recount, he challenged the State's allegations by filing a pretrial motion to quash and dismiss the indictments based on prosecutorial misconduct. In this motion, Hill III alleged he was deprived of his due process right to a disinterested prosecutor. Hill III asserted that both his father and Lisa Blue Baron ("Blue"), a friend of Watkins and a political patron, were responsible for large campaign donations to Watkins. First, Hill III claimed Watkins was acting under the influence of Hill's father, who had a motive to retaliate against Hill III because of the outcome of the federal trust litigation, and under the influence of Blue, who had a pending suit against Hill III seeking millions of dollars in attorneys' fees.[7] Second, Hill III claimed the prosecution against him was vindictive, and therefore violated his due process rights, because it was retaliation against him for exercising his legal right to engage in the trust and fee dispute litigation. Third, Hill III asserted his right to equal protection was violated because the D.A.'s office chose to

---

[7] Blue had been part of a team of lawyers who were representing Hill III in connection with, inter alia, the federal trust litigation between Hill III and his father. Blue represented Hill III from approximately November 2009 until July 2010, when a fee dispute arose between Hill III and his former attorneys. In July 2010, Hill's team of attorneys (including Blue) filed a motion to withdraw as Hill III's counsel in the federal trust litigation, and in October of that year they filed a federal complaint against the Hills seeking $50 million in attorneys' fees. On December 31, 2011, a federal judge issued a memorandum opinion and order holding that Hill III and his wife breached the attorneys' fee agreement, and judgment was entered against Hill III and his wife for $21.9 million. *See Campbell Harrison & Dagley L.L.P. v. Lisa Blue/Baron & Blue*, 843 F. Supp. 2d 673, 698–99 (N.D. Tex. 2011).

selectively prosecute him and his wife for conduct that does not normally lead to a criminal prosecution.

## VI. The Evidentiary Hearing

Our prior opinions also examined the testimony heard at the evidentiary hearing held in the criminal case, at which Watkins, Blue, and assistant district attorneys Terri Moore, Donna Strittmatter, and Stephanie Martin testified. When Blue, the first witness called by the defense, took the stand, she invoked her Fifth Amendment right on all questions. Watkins also refused to answer questions, citing his "right as an attorney to have the privilege and to protect my work-product." The trial court ordered Watkins to testify and answer questions. He refused, telling the court he would "continue to assert the privilege," at which point the court held him in contempt. The assistant district attorneys testified that Watkins attended an office "pitch session" during which a decision was made to indict Hill III. This was his only involvement in preparing the case for a grand jury shown in their testimony. It did not reveal any specific questions Watkins may have asked during the session, nor whether he personally directed an investigation of Hill III or influenced the timing of the presentation of the case to the grand jury. The evidence also showed Watkins had approximately 37 telephone calls with Blue, 14 of which occurred in March 2011—the month the Hills were indicted. Regarding the State's case against Hill III, Martin initially testified that from the moment she got the complaint, she thought she had a good case and was "always presenting it to the Grand Jury." But

handwritten notes she made about her conversations with David Pickett reflected that she told Pickett that after doing research, she did not see how she could prove a criminal case at that time. The trial court asked Martin, "The bank is not interested in prosecuting, and your client is not a victim; that's what you told Mr. Pickett?" Martin responded, "Yes." In addition, Martin later went back and added to her notes that she had talked to Pickett multiple times since her original note and that he was okay with not indicting "for the trust as a victim" and going forward with indictments listing the bank as the victim. Martin acknowledged she "probably" added that note sometime after Hill III filed his motion to dismiss.

## VII. The Trial Court's Ruling

The trial court in the criminal case expressed frustration that Watkins was "in the thick of it" and "the guy" where the case against Hill III was concerned, yet he did not testify. The court observed that "if the evidence supporting the Defendant's case is admitted . . . before this Court, the evidence that I felt supported the need for a hearing, why shouldn't I dismiss it if the State is blocking him from having his hearing, so to speak." After listening to the attorneys' arguments, the court stated that, "because of the failure of Mr. Watkins to testify in this hearing, the Defendant has been denied his right to have a meaningful hearing on his Motion to Dismiss. *And on that basis*, I'm dismissing the cases [emphasis added]."

We initially held that the trial court erred in conducting the pretrial evidentiary hearing because Hill did not establish a prima facie case of alleged constitutional

–8–

violations. We vacated the dismissal order and remanded with instructions to reinstate the indictments. *See State v. Hill, III,* Nos. 05-13-00421, 00423, 00424, & 00425-CR, 2014 WL 7497992 (Tex. App.—Dallas Dec. 29, 2014) (mem. op., not designated for publication), *rev'd*, 499 S.W.3d 853. But the Court of Criminal Appeals disagreed and held the trial court did not abuse its discretion in conducting an evidentiary hearing. *State v. Hill, III*, 499 S.W.3d at 871. The court's opinion specifically noted that, in its ruling, the trial court did not address the merits of Hill III's motion:

> The trial court judge did not address the merits of Hill's motion nor state on the record that she was dismissing the indictments because Hill met his burden to prove that he was being vindictively or selectively prosecuted. Rather, *she dismissed the indictments "because of the failure of Mr. Watkins to testify in this hearing."*

*Id*. at 869 (emphasis added). The Court of Criminal Appeals remanded the case to us to address the State's two remaining issues challenging the trial court's dismissal of the indictments with prejudice. After doing so, we affirmed the trial court's order, holding the trial court did not abuse its discretion in determining that Hill III's due process rights were violated, and in dismissing the case with prejudice. *State v. Hill, III*, 558 S.W.3d 280, 287 (Tex. App.—Dallas 2018, no pet.).

## VIII. Procedural History

Hill III initiated the underlying suit on August 15, 2019, by filing his original petition in Probate Court No. 2 of Dallas County, Texas, asserting causes of action against appellees for malicious prosecution, conspiracy, and aiding and abetting.

–9–

Appellees each filed motions to dismiss pursuant to the TCPA on the 21st and 22nd of October 2019.[8]

Hill III filed a first amended petition, his live pleading, on December 13, 2019, asserting the same causes of action. He also filed an "omnibus opposition" to appellees' motions to dismiss and a "submission of evidence" in opposition to appellees' motions to dismiss that ultimately included four declarations and approximately 121 exhibits—totaling nearly 4,000 pages of clerk's record. Appellees also filed a joint supplement to their motions to dismiss. Hill III filed a motion to strike this supplement as untimely or improper on December 16, 2019. Two days later, on December 18, appellees filed their joint reply in support of their motions and objected to Hill III's declarations and evidence on numerous grounds, including that the testimony in the declarations was conclusory and lacked personal knowledge.

The probate court held a hearing on appellees' motions to dismiss on January 10, 2020. On February 6, 2020, the court signed an order granting the motions to dismiss, in which it granted appellees' motions and sustained their objections to Hill III's evidence. The court's order does not specify the basis for its blanket evidentiary ruling. Following additional briefing and a hearing on appellees' requests for attorneys' fees and sanctions, the probate court signed its order and final judgment

---

[8] The two motions to dismiss are substantially similar, and in many respects identical.

relating to appellees' motions to dismiss on May 29, 2020, which awarded appellees attorneys' fees and sanctions under Chapter 27 of the Texas Civil Practice & Remedies Code. It is from the orders and final judgment that Hill III brings this interlocutory appeal.[9]

## DISCUSSION

## I. Appellant's Issues

Hill III brings the following three issues:

Issue 1: Did each Appellee establish, by a preponderance of the evidence, that each of Appellant's claims was based on, related to, or in response to each Appellee's exercise of their constitutional right of free speech, right to petition, or right of association?

Issue 2: If either Appellee did establish that the TCPA applied to the claims asserted against them, did Appellant establish by clear and specific evidence a prima facie case for any of his claims against that Appellee?

Issue 3: Did either Appellee prove each essential element of any valid defenses?

## II. Standard of Review

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re*

---

[9] Hill III filed two other related lawsuits in Harris County, Texas, against various defendants in June of 2019, approximately two months before this case was brought. One, referred to in appellees' brief as the "lawyers' petition," was a suit brought by Hill III against Lisa Blue and ten other defendants. The other, referred to as the "Watkins petition," was a suit filed by Hill III against Craig Watkins and fourteen other defendants. Both suits involve, as here, claims for malicious prosecution, conspiracy, and aiding and abetting, and concern allegations relating to the instant mortgage fraud indictments. The trial court granted the defendants' TCPA motions to dismiss, and Hill III's appeals are, at present, pending before the Houston First Court of Appeals (cause numbers 01-20-00418-CV & 00419-CV).

–11–

*Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). At the time Hill III's suit was filed, section 27.005(b) of the TCPA provided:

> Except as provided by Subsection (c), on the motion of a party under Section 27.003, a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association.

TEX. CIV. PRAC. & REM. CODE § 27.005(b).[10] Thus, the TCPA permits a defendant to move for dismissal of a legal action that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." *Id*. § 27.003(a).

In deciding whether a legal action should be dismissed under the TCPA, the trial court "shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a); *Goldberg v. EMR (USA Holdings) Inc*., 594 S.W.3d 818, 824 (Tex. App.—Dallas 2020, pet. denied). We review de novo the trial court's ruling on a TCPA motion to dismiss. *See Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019); *Goldberg*, 594 S.W.3d at 833 (citing *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018)). In conducting that review,

---

[10] In 2019, the legislature deleted the phrase "relates to" from the statute, which now permits a party to file a motion to dismiss a legal action if it is "based on or is in response to" the party's exercise of a TCPA-protected right. *See* Act of June 2, 2019, 86th Leg., R.S., Ch. 378, §§ 2, 12 (effective September 1, 2019); TEX. CIV. PRAC. & REM. CODE §§ 27.003(a), 27.005(b). This suit was filed on August 15, 2019, before the amendments took effect, and neither party disputes that the pre-amendments version of the statute applies. Thus, references and citations to the TCPA in this opinion are to the version of the statute existing before the 2019 amendments took effect.

–12–

we consider, in the light most favorable to the nonmovant, the pleadings and any supporting and opposing affidavits stating the facts on which the claim or defense is based. *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 424 (Tex. App.—Dallas 2019, pet. denied).

Our review of a TCPA ruling generally involves a three-step analysis. *Creative Oil*, 591 S.W.3d at 132; *Youngkin*, 546 S.W.3d at 679–80; *Goldberg*, 594 S.W.3d at 824. At step one, the TCPA movant has the burden to show by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of association, right of free speech, or the right to petition. *See Creative Oil*, 591 S.W.3d at 132 (citing TEX. CIV. PRAC. & REM. CODE § 27.005(b)); *Youngkin*, 546 S.W.3d at 679; *Goldberg*, 594 S.W.3d at 824.

If the movant does so, the analysis proceeds to step two, where the burden of proof shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of the claim asserted. *See Creative Oil*, 591 S.W.3d at 132 (citing TEX. CIV. PRAC. & REM. CODE § 27.005(c)); *Youngkin*, 546 S.W.3d at 679; *Goldberg*, 594 S.W.3d at 824. A "prima face case" refers to "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam) (orig. proceeding)). "Clear and specific" evidence is "unambiguous," "sure," or "free from doubt," and,

for the latter, "explicit" or "referring to a particular named thing." *Id.* (quoting *KTRK Television v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)).

In *Lipsky*, the Texas Supreme Court explained how this evidentiary standard should be applied, stating that "[b]ecause the Act requires more, mere notice pleading—that is, general allegations that merely recite the elements of a cause of action—will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim." *Lipsky*, 460 S.W.3d at 590–91. The TCPA nonmovant may rely on circumstantial evidence, i.e., "indirect evidence that creates an inference to establish a central fact," "unless the 'connection between the fact and the inference is too weak to be of help in deciding the case.'" *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019) (quoting *Lipsky*, 460 S.W.3d at 589); *see also Lipsky*, 460 S.W.3d at 591 (TCPA "does not impose a higher burden of proof than that required of the plaintiff at trial," and does not "require direct evidence of each essential element of the underlying claim to avoid dismissal.").

If the movant meets the first step, but the nonmovant does not make the required showing of a prima facie case under step two, the trial court must dismiss the nonmovant's claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b), (c).

If, however, the nonmovant satisfies its burden at step two, the analysis proceeds to step three, where the burden of proof shifts back to the movant to establish by a preponderance of the evidence each essential element of a valid

defense to the nonmovant's claim, resulting in dismissal under the statute if the movant does so. *Creative Oil*, 591 S.W.3d at 132 (citing TEX. CIV. PRAC. & REM. CODE § 27.005(d)); *Youngkin*, 546 S.W.3d at 679–80; *Goldberg*, 594 S.W.3d at 824.

### III. Step One: Did Appellees Show the TCPA Applied?

### A. Hill III's Allegations

Step one of the TCPA focuses on whether appellees proved by a preponderance of the evidence that Hill III's claims were based on, related to, or in response to appellees' exercise of a protected right. *E.g.*, *Creative Oil*, 591 S.W.3d at 132. The Texas Supreme Court has said the plaintiff's petition is the "best and all-sufficient evidence of the nature of the action," and the applicability of the TCPA. *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (internal quotations and citation omitted). "When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more." *Id.*; *see Watson v. Hardman*, 497 S.W.3d 601, 607 (Tex. App.—Dallas 2016, no pet.) ("[A] plaintiff's own live pleading can satisfy a movant's 27.005(b) burden."); *see also MacFarland v. Le-Vel Brands LLC*, No. 05-16-00672-CV, 2017 WL 1089684, at *7 (Tex. App.—Dallas Mar. 23, 2017, no pet.) (mem. op.).

Turning, therefore, to Hill III's live pleading, his first amended petition, he alleges that years before his death in 2017, Hill Jr. "developed a deep-seated animus towards" Hill III, his only son. With the assistance of other family members and the help of advisors, Hill Jr. initiated or procured Hill III's criminal indictment by

influencing the Dallas D.A., Watkins, to seek the indictments. Hill III alleges the indictments were based on false information and were factually inaccurate.

Hill III claims he made no misrepresentations about the ownership of the Bordeaux property, stating that when he applied for the loan in 2009, he and his wife "owned 100% of the property in fee simple, as evidenced by a deed that was filed of public record." He also states that OmniAmerican Bank was aware, before issuing the loan, of the potential claim to an 80 percent interest in the property, "and apparently satisfied itself that this alleged interest was no impediment to issuing the loan." Hill III points out that the bank and its mortgage broker never accused him of fraud or deception, and that the mortgage broker reacted to the indictments by stating that "[t]here was nothing fraudulent as we verified tax returns[,] credit and title."

Even so, according to Hill III, Watkins, "after being improperly influenced by [Hill] Jr., Lisa Blue, and others," filed criminal charges against him. Hill III alleges that "[a]ll of this was perpetrated out of spite and malice and for no legitimate purpose," and that none of the parties involved in this process had probable cause to believe he committed a crime because they "knew that the lynchpin of the charges— [Hill] III's alleged ownership of only 20% of the residence—was false and knew that OmniAmerican Bank had not been misled or defrauded."

Hill III then sets out the crux of his allegations regarding his malicious prosecution claim—i.e., the false reports, both written and oral, that he claims Hill

–16–

Jr., Mike Lynn, and David Pickett submitted to the Dallas D.A.'s office:

30. In an attempt to lend legitimacy to his malicious attempts to get Al III indicted on false charges, Al Jr. (acting directly and through Mike Lynn and David Pickett) touted to DA Watkins the fact that, in 2004, Al III and his wife had entered into a Real Estate Sales Contract purporting to convey to the "Albert Hill Trust" an 80% undivided interest in the property at 4433 Bordeaux Avenue. Al Jr. was at the time a beneficiary of that trust (and Al III was a remainder beneficiary), and Ivan Irwin, Jr. was its trustee. It is the alleged conveyance of this 80% interest that, according to Al Jr., Mike Lynn, and David Pickett (and later the indictments), rendered false Al III's representations in the OmniAmerican loan application about the ownership of the property. When seeking to have Al III indicted, Al Jr., David Pickett, and Mike Lynn repeatedly characterized this as a real transaction that had actually and legally operated to transfer an 80% interest in the residence to the Albert Hill Trust.

31. But, as Al Jr., David Pickett, and Mike Lynn knew, and as Watkins and his staff also knew or could have easily learned with only minimal investigation, this purported transaction was not a real conveyance, as demonstrated in part by the fact that the deed supposedly conveying an 80% interest to the trust was not recorded at the time in the real property records. In fact, the alleged transaction was intended in 2004 as an advance to Al III on expected inheritances. As known by Al Jr., David Pickett, Mike Lynn, and Ivan Irwin, and as Watkins and his staff also knew or could have easily learned with only minimal investigation, it was illegal and unenforceable under Texas law to the extent it purported to encumber the Bordeaux property. As a matter of Texas law, the existence of this purported transaction did not diminish the 100% interest in the property owned by Al III and his wife, as was in part shown by OmniAmerican's decision, made with knowledge of the alleged transaction, to accept Al III's loan application and to loan him $500,000

32. The indictments against Al III were nevertheless procured in part by supplying false information about this alleged transaction—sometimes directly by Al Jr. and other times through his intermediaries—to Watkins and to the District Attorney's Office. For example, Al Jr. directed Mike Lynn to make a written submission to the DA's office dated February 22, 2010. That submission, which contained false and misleading information, was made on behalf of Al

–17–

Jr., and he (along with Mike Lynn) is fully responsible for its contents, as demonstrated in part by the introduction to the submission itself, which states: "Albert G. Hill, Jr. complains of his son, Albert G. Hill, III . . . ." Mike Lynn was more than happy to deliver this referral since, at the time, he harbored his own animus and malice towards Al III, based on Al Ill's role in exposing Mike Lynn's role in suborning perjury. Although Mike Lynn is an attorney, delivery of this submission to the DA's office did not require a law license or any legal expertise. In fact, submitting a criminal referral to the DA and lobbying the DA for an indictment is expressly outside the scope of any appropriate legal representation in which Lynn could have permissibly engaged as Al Jr.'s lawyer in civil litigation.

33. Just a day or two prior to this submission, when Al III refused one of Al Jr.'s demands, Al Jr. told him he would "see him in jail," which serves to highlight the malice and lack of probable cause that motivated the criminal referral. The malice motivating Al Jr. in February 2010 is further shown by a remarkable pleading that Al Jr. filed against Al III in Dallas County on the same day as this submission to the DA in which Al Jr. labelled his own son "the apostate"; compared him to Lucifer; called him a sociopath; ridiculed him for reading the Bible; and viciously insulted Al Ill's wife and her parents.

34. Motivated by this malicious intent, Al Jr. further directed David Pickett, a long-time advisor, to make a similar written submission to the DA's office dated April 14, 2010. That written statement reiterated the same false assertions contained in the submission from February 22, 2010. Although the DA's office misplaced that written submission for a period of time, it was ultimately found or recreated, and the information in it (and in the February 2010 submission) formed the pretext of the indictments ultimately issued against Al III in March and April of 2011. This submission and subsequent efforts by David Pickett to bring about Al Ill's prosecution were not undertaken by Pickett in his capacity as an attorney.

35. In addition, Al Jr. and Mike Lynn and David Pickett (at Al Jr.'s direction and for their own reasons) personally met with and orally conveyed information to representatives of the DA's office on one or more occasions and repeated to prosecutors the false information contained in the above-referenced written submissions.

36. The written and oral submissions made to the DA's office by and

on behalf of Al Jr., Mike Lynn, and David Pickett (including the February 2010 submission by Lynn and the April 2010 submission by Pickett) contained misrepresentations by both commission and by omission. They falsely stated that the Albert G. Trust had "been defrauded." They falsely represented that Al III and his wife "only own a 20% interest in the home." They falsely stated that Al III had claimed "he had an income of $55,000," when it was really OmniAmerican Bank who had directed Al III on how to represent his income on the loan application. They stated that Al III and his wife had signed a deed transferring "80% of their residence in favor of the Albert Hill Trust," without revealing that the alleged conveyance was wholly unenforceable. They made the false statement that Al III and his wife "only owned a 20% interest in the residence," despite Al Jr., Lynn, and Pickett knowing that the alleged transaction transferring an 80% interest was illegal and void under Texas law. The submissions also failed to disclose that an alleged deed transferring 80% of the property was not filed in the real estate records until 2009, after the loan was made by OmniAmerican Bank and as a part of the plan to falsely accuse Al III of criminal activity. They also failed to disclose that a notice purporting to describe (but not to effectuate) the unenforceable 80-20 deal was a matter of public record available for OmniAmerican Bank to review as part of its underwriting of the loan, thus refuting any suggestion that OmniAmerican Bank had been defrauded. The submissions also concealed the fact that, by July 2009, Al Jr., Mike Lynn, David Pickett, and other representatives of the Albert Hill Trust had already been in contact with OmniAmerican Bank and knew full well from those contacts that OmniAmerican Bank had not been defrauded or deceived and had been apprised of all material facts. Finally, the submissions failed to reveal that, by February 22, 2010, the loan had been repaid in full, OmniAmerican's lien on the residence had been released, and the Albert G. Hill Trust had acknowledged that it had no further claims related to the allegedly improper loan.

Regarding pressure on the D.A.'s office to prosecute, Hill III alleges his father was not content to rely on false reports alone to ensure Hill's indictment. He claims Hill Jr. "exerted nearly continuous pressure on Watkins and his staff to get indictments against [Hill] III on file," and that the pressure tactics included having Pickett "bombard" the D.A.'s office with written and oral demands for indictments.

–19–

Hill III also claims Hill Jr. caused his lawyers and family members to make "substantial (and for them unprecedented) campaign contributions" to Watkins, and that they made charitable contributions to fund programs at the D.A.'s office (or that were supported by the D.A.) that the D.A. then used to "burnish his public image." Hill III's petition alleges, for example, that Lisa Blue and one of Lynn's former law partners, Jeff Tillotson, contributed money to Watkins's election campaign in 2010 and 2011, and that Blue made charitable donations in honor of Watkins. In addition, Hill III alleges that Hill Jr. facilitated "the hiring of one of [Hill] Jr.'s own private lawyers . . . as a special prosecutor at the D.A.'s office to help spearhead the criminal case against [Hill] III." Hill III alleges that all "this additional activity was part of the process through which these indictments were initiated and procured and through which Watkins was influenced and essentially bribed."

Hill III's civil conspiracy claim alleges that Hill Jr., Lisa Blue, Mike Lynn, Jeff Tillotson, Craig Watkins, David Pickett, Ivan Irwin, and fourteen other individuals "formed by agreement a combination to injure and harm [Hill] III." Hill III claims their objective was the accomplishment of an unlawful purpose—i.e., the initiation, procurement, and continuation of his illegal and unconstitutional prosecution on "bogus charges." He alleges the members of the "combination" had a meeting of the minds regarding his prosecution, and on the course of action—i.e., "supplying knowingly false information to prosecutors, exerting undue influence over prosecutors, and providing financial benefits to [the D.A.]." Hill III further

alleges that several members of this combination committed unlawful, overt acts in furtherance of the combination's agreed objective and course of action, and that he suffered actual damages as a proximate result.

Hill III's claim for aiding and abetting alleges that each of the individuals named in his petition had knowledge of the torts being committed against him by Craig Watkins, Hill Jr., Lisa Blue, Mike Lynn, David Pickett, and Jeff Tillotson. He alleges that each defendant had the intent to assist the other parties in the commission of these torts, and they "provided assistance or encouragement that was a substantial factor" in their commission.

Hill III's petition attempts to connect Irwin to the purported conspiracy by claiming (1) Irwin was one of Hill Jr.'s "closest confidants" for approximately 50 years; (2) Irwin served as a lawyer for Hill Jr. and various entities Hill Jr. controlled; (3) Irwin served as a trustee of various trusts which benefitted Hill Jr. and other members of the Hunt/Hill family; (4) Irwin served as an officer, director, and/or business advisor for various entities owned by Hill Jr.; (5) in July 2004, six years before the Lynn memorandum, Irwin, as trustee of the Trust, entered into the Bordeaux transaction, described by Hill III as a "sham transaction" that Irwin "knew full well" did not "convey any interest in the [Bordeaux] residence to the . . . Trust"; and (6) in 2016, five years after Hill III's indictment, Irwin was an "Advisory Board Member" of certain irrevocable trusts of which Hill III was a beneficiary (none of them, insofar as the petition alleges, related to the criminal proceedings in this case),

–21–

trusts that Hill III claims were improperly terminated. In addition, Hill III alleges that "Irwin also participated in efforts to shower the DA with campaign contributions."

**B. The Underlying Tort and Derivative or Dependent Claims**

In his first issue, Hill III argues appellees did not establish by a preponderance of the evidence that each of his claims was based on, related to, or in response to each appellee's exercise of their constitutional right of free speech, right to petition, or right of association. Appellees contend the TCPA applies to Hill III's malicious prosecution claim because the TCPA covers the filing of criminal complaints and participation in criminal proceedings. Appellees also argue the TCPA applies to Hill III's claims for conspiracy and aiding and abetting because they are derivative or dependent in nature. Appellees argue that if the malicious prosecution allegations are subject to the TCPA, so, too, are Hill III's derivative or dependent claims for conspiracy and aiding and abetting.

Civil conspiracy is a derivative tort. *E.g.*, *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920 (Tex. App.—Dallas 2014, pet. denied) (quoting *Tilton*); *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Tilton*). It "is a theory of vicarious liability and not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "That is, a defendant's liability for conspiracy

–22–

depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681.

As for aiding and abetting, the Texas Supreme Court "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting," *First United PenteCostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017), and the Fifth Circuit has stated that "no such claim exists in Texas." *In Re Deputy Orthopaedics, Inc.*, 888 F.3d 753, 782 (5th Cir. 2018). But to the extent such a claim exists under Texas law, aiding and abetting, like civil conspiracy, is also a "dependent" or derivative claim that is "premised on" an underlying tort. *W. Fork Advisors, LLC*, 437 S.W.3d at 921.

If the underlying tort fails, "there can be neither a conspiracy nor an aiding and abetting claim related to that failed tort." *Id.*; *see Renate Nixdorf GmbH & Co. KG v. TRA Midland Properties, LLC*, No. 05-17-00577-CV, 2019 WL 92038, at *5 (Tex. App.—Dallas Jan. 3, 2019, pet. denied) (mem. op.) ("Aiding and abetting is a dependent claim premised on an underlying tort; there can be no aiding and abetting claim related to an underlying tort claim that fails."); *Siltek Grp. Texas, LLC v. A&A Landscape & Irrigation LP*, No. 05-17-00042-CV, 2018 WL 3342691, at *4 (Tex. App.—Dallas July 9, 2018, no pet.) (mem. op.) ("Without an underlying tort, there can be no independent liability for civil conspiracy."); *see also Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *10 n.17 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (mem. op.); *Castille v. Port Arthur Parolmen's*

–23–

*Hunting Club*, No. 09-18-00395-CV, 2020 WL 1879475, at *6 (Tex. App.— Beaumont April 16, 2020, pet. denied) (mem. op.); *Vertex Servs. LLC v. Oceanwide Houston, Inc.*, 583 S.W.3d 841, 857 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing *Agar*, 580 S.W.3d at 141); *Arcturus Corp. v. Espada Operating, LLC*, No. 13-13-00713-CV, 2016 WL 4272381, at *11 (Tex. App.—Corpus Christi Edinburg Aug. 11, 2016, no pet.) (mem. op.). As the court stated in *Castille*, "Liability for a conspiracy comes from the act done to further the conspiracy, not the conspiracy itself. The elements of a claim for civil conspiracy require the participation in an underlying intentional tort, and malicious prosecution is an intentional tort." *Castille*, 2020 WL 1879475, at *6 (citation omitted). Therefore, because the civil conspiracy and aiding and abetting claims are derivative or dependent in nature, they are "connected" to the underlying tort of malicious prosecution, and they "survive[ ] or fail[ ] alongside it." *Agar*, 580 S.W.3d at 141. We must, then, analyze whether the TCPA applies to Hill III's conspiracy and aiding and abetting claims by examining the alleged underlying tort—malicious prosecution. *Clayton Mountain, LLC, et al. v. Susann Ruff*, No. 11-20-00034-CV, 2021 WL 3414754, at *6 (Tex. App.—Eastland Aug. 5, 2021, no pet.) (mem. op.) (noting that because civil conspiracy claim was derivative, it was connected to the underlying tort and survived or failed alongside it, and the court had to thus "analyze whether the TCPA applies to [plaintiff's] conspiracy claim in connection with the alleged underlying tort") (citing *Agar*, 580 S.W.3d at 141); *e.g.*, *W. Fork Advisors, LLC*, 437 S.W.3d at 921;

–24–

*Mogged*, 2020 WL 7074390, at *10 n.17; *Castille*, 2020 WL 1879475, *6.

## C. Exercise of the Right to Petition

Turning to that question, the TCPA applies if the movant "shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to" the defendant's exercise of (1) the right of free speech, (2) the right to petition, or (3) the right of association, as those rights are defined in the TCPA. TEX. CIV. PRAC. & REM. CODE § 27.005(b). The TCPA defines the exercise of the right to petition as including "a communication in or pertaining to . . . a judicial proceeding [or] an official proceeding, other than a judicial proceeding, to administer the law[.]" *Id*. § 27.001(4)(A)(i), (ii). "'Official proceeding' means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id*. § 27.001(8). A "'[c]ommunication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id*. § 27.001(1). The right to petition also includes "a communication that is reasonably likely to encourage consideration or review of an issue by a governmental body or in another governmental or official proceeding." *Id*. § 27.001(4)(C). Finally, the TCPA's definition of the right to petition includes "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." *Id*. § 27.001(4)(E).

Reporting crimes and making statements to police regarding incidences of

–25–

perceived wrongdoing implicates the right to petition. *E.g.*, *Cal. Commercial Inv. Group, Inc. v. Herrington*, No. 05-19-00805-CV, 2020 WL 3820907, at *3 (Tex. App.—Dallas July 8, 2020, no pet.) (mem. op.); *Ford v. Bland*, 2016 WL 7323309, at *1 (Tex. App.—Houston [14th Dist.] Dec. 15, 2016, no pet.) (mem. op.). As one court stated, "[w]hen a person interacts with the police to report perceived wrongdoing, that person is exercising their right to petition, as that right is defined in the TCPA." *Buckingham Senior Living Cmty., Inc. v. Washington*, 605 S.W.3d 800, 807 (Tex. App.—Houston [1st Dist.] 2020, no pet.). In addition, filing a police report, whether true or false, implicates a person's right to petition the government. *E.g.*, *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 609 (Tex. App.—San Antonio 2018, pet. denied) (statements to police, even if false, were an exercise of right of petition under the TCPA); *Herrington*, 2020 WL 3820907, at *4 (rejecting argument that TCPA did not apply to claim based on allegedly defective criminal complaint and indictment); *Murphy USA, Inc. v. Rose*, No. 12-15-00197-CV, 2016 WL 5800263, at *3 (Tex. App.—Tyler Oct. 5, 2016, no pet.) (mem. op.) ("Filing a police report, whether true or false, implicates a person's right to petition the government, and this right must be considered when determining whether a person filed a false report."). And statements made to members of a district attorney's office in connection with a criminal prosecution of someone else implicate the speakers' rights to petition. *Castille*, 2020 WL 1879475, at *5.

The TCPA's "exercise of the right to petition" also includes a communication

–26–

in or pertaining to "a judicial proceeding" as well as "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." TEX. CIV. PRAC. & REM. CODE Ann. § 27.001(4)(A)(i), (E). In addition, the "broad definition" of "communication" under TCPA "encompasses a petition in a lawsuit, which is a 'judicial proceeding.'" *See Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 227 (Tex. App.—Austin 2018, no pet.). A "judicial proceeding," as used in the TCPA, involves an "actual, pending, judicial proceeding," not an anticipated or potential judicial proceeding. *Levatino v. Apple Tree Café Touring, Inc.*, 486 S.W.3d 724, 728–29 (Tex. App.—Dallas 2016, pet. denied); *see Mattress Firm, Inc. v. Deitch*, 612 S.W.3d 467, 486 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see also Dyer*, 573 S.W.3d at 429.

### D. Exercise of the Right of Free Speech

Separately, a claim based on a report of a crime implicates the right of free speech under the TCPA. *Herrington*, 2020 WL 3820907, at *3; *see Keel Recovery, Inc. v. Tri County Adjusters, Inc.*, 05-19-00686-CV, 2020 WL 5269603, at *4 (Tex. App.—Dallas Sept. 4, 2020, no pet.) (mem. op.). The TCPA defines the exercise of the right of free speech as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). A matter of public concern includes, among other things, "an issue related to . . . health or safety," "environmental, economic, or community well-being," "the government," or "a

public official or public figure." *Id*. § 27.001(7)(A)-(D).

The TCPA "does not require communication in public form," and it "does not require that the statements specifically 'mention' health, safety, environmental, or economic concerns, nor does it require more than a 'tangential relationship' to the same." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017). Public matters include the "commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions," which "are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975); *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017); *Deaver v. Desai*, 483 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at *4 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.) (internal quotations and citations omitted) ("Public matters include, among other things, commission of a crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions."); *Castille*, 2020 WL 1879475, at *5 ("Reporting a crime to law enforcement and related judicial proceedings arising from prosecutions are matters of public concern.").

### E. Appellees Met Their Burden of Showing the TCPA Applies

Hill III maintains that the TCPA does not apply to his claims against appellees because the TCPA only applies to a "proper" exercise of First Amendment rights.

–28–

In other words, the complaints at issue were not "legitimate" because they were not lawful or constitutionally protected activities. Hill III argues "[a]ppellees have been named as defendants for initiating and conspiring with Watkins in a malicious prosecution of [Hill] III and for violating [Hill] III's constitutional rights," and that "a number of Texas courts, including this Court, already have passed judgment on the wrongful nature of Watkins's underlying conduct."

Hill III cites and discusses mainly two cases as support. *See Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 481 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (en banc); *Bandin v. Free & Sovereign State of Veracruz*, 590 S.W.3d 647, 653 (Tex. App.—Houston [14th Dist.] 2019, pet filed). In *Bandin*, the court of appeals quoted language from Justice Keyes' concurrence in *Universal Plant Services, Inc. v. Dresser-Rand Group, Inc.*, advocating that "'[t]o read out of the TCPA the requirement that movants must prove that the activities in which they . . . engaged [were] at least *arguably* lawful constitutionally protected activities contradicts the statute's purpose and its plain language.'" *Bandin*, 590 S.W.3d at 653 (emphasis added) (quoting 571 S.W.3d 346, 371 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (Keyes, J., concurring)). *Bandin* involved an alleged conspiracy to commit theft or conversion, and in *Universal Plant* the allegations centered on misappropriation or conversion of trade secrets and other protected information. *Bandin*, 590 S.W.3d at 652; *Universal Plant*, 571 S.W.3d at 350, 371. Neither case, though, involved any identified acts of speech or association on the part of the parties

–29–

that could be given a non-tortious interpretation. *Universal Plant*, 571 S.W.3d at 371 (Keyes, J., concurring); *see Bandin*, 590 S.W.3d at 651, 653–54. The court in *Bandin* ultimately held that the TCPA did not apply "to claims of conspiracy to convert or unlawfully appropriate property belonging to others." *Id*. at 654.

*Gaskamp* similarly involved allegations that the defendants "act[ed] in collusion" to misappropriate trade secrets, fraudulently transfer assets, tortiously interfere with contracts and business relations, and engage in unfair competition. *Gaskamp*, 596 S.W.3d at 464. The court explained that the concept of "common interests," as that phrase was used in the TCPA's definition of "exercise of the right of association," necessarily included a "public component." *Id*. at 473–74. But in *Gaskamp*, contrary to this case, there were "no allegations that the tortfeasors 'join[ed] together to collectively express, promote, pursue, or defend' any public or community interests." *Id*. at 476.

The situation in the present case is quite different. Hill III's petition establishes on its face that his claims against appellees relate to the exercise of the right to petition and/or implicate the exercise of the right of free speech. He alleges Hill Jr. filed a criminal complaint and submitted false information to the D.A. through the February 2010 Lynn memorandum, the March 2010 meeting, and the April 2010 Pickett submission. Hill III also alleges Hill Jr.'s malice towards him was supported by statements he made in a February 2010 pleading Hill Jr. filed in Dallas County—part of the "spider web of litigation" we mentioned earlier. Hill III

further alleges that Hill Jr. stated, just a day or two before Lynn's memorandum was submitted, that he would "see [Hill III] in jail." In addition, Hill III alleges appellees and numerous other individuals, including Ivan Irwin, Mike Lynn, and Lisa Blue, conspired and/or "aided and abetted" in bringing about his criminal prosecution.

As shown by the allegations in Hill III's own pleadings, the communications he complains of concern the initiation or procurement of criminal charges against him—altogether different from the situation in *Bandin* or *Gaskamp*. Neither of those cases involved recognized constitutional activities such as "[w]hen a person interacts with the police to report perceived wrongdoing," which is the exercise of "their right to petition, as that right is defined in the TCPA." *Buckingham Senior Living,* 605 S.W.3d at 807. Furthermore, while this Court has not adopted the *Bandin* court's interpretation of the TCPA, the claims asserted here involve at least *arguably* lawful constitutionally protected activities. *Bandin*, 590 S.W.3d at 653. And, finally, Hill III's argument goes even further than *Bandin*, effectively requiring us to conduct a review of the actual behavior and motivations behind appellees' communications at step one of the TCPA analysis, before reaching the elements of Hill III's malicious prosecution claim at step two. Hill III cites no authority for the proposition that the TCPA requires a threshold merits determination of his malicious prosecution claim to trigger coverage.

Hill III's accusation that appellees acted in their own pecuniary interest does not remove TCPA protections. In considering whether claims involve matters of

–31–

public concern, a matter of public concern for purposes of the TCPA must involve more than private pecuniary interests, and "[t]he phrase 'matter of public concern' commonly refers to matters 'of political, social, or other concern to the community,' as opposed to purely private matters." *Creative Oil,* 591 S.W.3d at 135 (quoting *Brady v. Klentzman*, 515 S.W.3d at 884). For example, the internal communications in *Gaskamp* "had no public relevance beyond the pecuniary interest of the private parties." *Gaskamp*, 596 S.W.3d at 477 (appellants did not meet their burden of showing internal communications were "made in connection with a matter of public concern"). The situation in this case is, again, very different: The "public relevance" is shown by the allegations in Hill III's pleadings, which concern the public's interest in reporting a suspected crime or filing a criminal complaint. *See Gaskamp*, 596 S.W.3d at 480 ("The nature of the legal action is revealed by the factual allegations in the pleadings."). An alleged conspiracy to engage in such activities likewise falls under the TCPA, for reasons we have already noted.

At step one we concern ourselves only with whether Hill III's lawsuit against appellees is based on, related to, or in response to appellees' exercise of the right of free speech or the right to petition. TEX. CIV. PRAC. & REM. CODE § 27.005(b). We reject Hill III's attempt to alter the parties' burdens of proof, and, as the TCPA requires, confine our inquiry to appellees' initial burden—i.e., showing the statute applies to Hill III's claims against them. We conclude appellees have satisfied that burden at step one by showing the TCPA applies, and we therefore overrule Hill

–32–

III's first issue.[11]

## IV. Step Two: Did Hill III Establish a Prima Facie Case?

### A. Trial Court's Evidentiary Ruling

Because the TCPA applies to Hill III's allegations, he had the burden, at step two, of presenting clear and specific evidence of a prima facie case for each essential element of his claims. TEX. CIV. PRAC. & REM. CODE § 27.005(c). In his second issue, Hill III argues that if appellees established that the TCPA applies to his claims against them at step one, he established by clear and specific evidence a prima facie case for his claims. Before addressing this issue, however, we must examine some other matters raised by the parties.

The first question concerns the trial court's evidentiary ruling. We noted before that, as support for his omnibus opposition to appellees' TCPA motions to dismiss, Hill III attached or submitted approximately 121 exhibits and four declarations, three of them (an original declaration and two supplements) executed by Hill III—totaling nearly 4,000 pages of clerk's record. Appellees made numerous evidentiary objections to the declarations, including hearsay, relevance, conclusory statements, lack of personal knowledge, and best evidence. Altogether, more than 270 separate objections were lodged by appellees, most of them on multiple grounds.

---

[11] Because we conclude Hill III's allegations relating to the filing of a criminal complaint and/or participation in criminal proceedings are sufficient to invoke the TCPA, we do not address appellees' arguments regarding alleged political and/or charitable contributions made by appellees or individuals acting on their behalf.

Appellees also brought hearsay, relevance, or lack of authentication objections to some of Hill III's exhibits. The trial court granted appellees' evidentiary objections without specifying the basis for its ruling.

In his opening brief on appeal, Hill III argues the trial court erred in sustaining appellees' "voluminous objections to virtually all of [Hill] III's evidence." He asserts that "[t]he probate court's blanket evidentiary ruling against [Hill] III was in error," he cites to some cases discussing the TCPA's evidentiary standards, and he concludes that "the probate court's one-sentence, blanket evidentiary ruling must be reversed." But Hill III's brief fails to identify or even cite to any evidence he claims was improperly excluded by the trial court, nor does he make a specific argument for why appellees' objection or objections to any evidence should have been overruled.

Responding to appellees' contention that his argument is inadequately briefed and, thus, waived, Hill III asserts that he "properly raised the impropriety of the trial court's blanket evidentiary ruling such that [we] may review those rulings as they apply to [Hill III's]" original and supplemental declaration. Hill III also argues he was "not required to challenge each specific objection raised by [a]ppellees on the presumption that each was independently granted by the trial court's blanket evidentiary ruling." Once again, however, Hill III does not identify or cite to any evidence that was allegedly improperly excluded by the trial court, nor does he make a specific argument regarding why appellees' objection or objections should have

been overruled.

Section 27.006 of the TCPA states the rule on permissible evidence in a TCPA action, and the pre-amendments TCPA provided that, in considering whether a legal action should be dismissed under Chapter 27, the trial court "shall consider the pleadings and supporting and opposing affidavits." TEX. CIV. PRAC. & REM. CODE § 27.006(a). This Court has declined to "apply wholesale" the summary judgment affidavit cases in a TCPA context, but, like the El Paso Court of Appeals when it addressed the pre-amendment TCPA, we have said "the 'clear and specific' standard in the TCPA at least requires us to reject conclusory claims made by an affiant." *Equine Holdings, LLC v. Jacoby*, No. 05-19-00758-CV, 2020 WL 2079183, at *4 (Tex. App.—Dallas Apr. 30, 2020, pet. denied) (mem. op.); *see MVS Int'l Corp. v. Int'l Advert. Sols.*, LLC, 545 S.W.3d 180, 192 (Tex. App.—El Paso 2017, no pet.) ("While we are not inclined to apply wholesale the summary judgment affidavit cases here, we are confident that the 'clear and specific' standard in the TCPA at least requires us to reject conclusory claims made by an affiant.").

Hill III cites *Equine Holdings* and *MVS*, and he argues "the probate court's evidentiary rulings based on objections other than being conclusory or lack of personal knowledge were improper and prejudicial." But no such statement of law can be found in either case, and, moreover, many of appellees' objections to Hill III's evidence asserted the challenged statements were conclusory or lacked personal knowledge. Hill III leaves us to speculate which evidence he believes should have

been admitted; to determine which evidence, if any, was not objected to by appellees and/or excluded by the court; and whether any unspecified errors in excluding that unspecified evidence caused an improper judgment requiring reversal.

This deficiency becomes more obvious when one considers the lengthy record, which includes thousands of pages of evidence and hundreds of evidentiary objections. The trial court, as we noted before, granted appellees' objections to Hill III's evidence without specifying the basis for its ruling. Instead of specifically addressing appellees' objections and the trial court's ruling, Hill III leaves it to us to sift through hundreds of evidentiary objections and thousands of pages of clerk's record and determine where, precisely, in nearly 4,000 pages of clerk's record we will find the requisite clear and specific evidence. In effect, he presents a massive record and argues clear and specific evidence is in there *somewhere*. The TCPA, however, does not require us to sift through the record looking for evidence to support the nonmovant's prima facie case. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c); *Cavin v. Abbott*, 545 S.W.3d 47, 72 (Tex. App.—Austin 2017, no pet.). As the Austin Court of Appeals stated in *Cavin*:

> In this case, the TCPA "evidence" presented by the Abbotts includes, as previously noted, the numerous documents that they attached and incorporated into their petition, effectively comprising a petition of over 200 pages in length. These documents are potentially a fertile source of "clear and specific" evidence to meet the Abbotts' burden— indeed, one cannot fathom evidence of an allegedly actionable written communication that could be more "clear and specific" than a copy of the communication itself. However, in neither the district court nor on appeal have the Abbotts undertaken to link particular facts reflected in

the documents to each of the essential elements for which they must present a prima-facie case with respect to each claim. Instead, the Abbotts have merely recited what they view as the essential elements of each claim; cited en masse to pages of the record they deem relevant to some unspecified element or elements of that claim; but provided no argument, analysis, or explanation as to which record reference supports which elements or (perhaps more critically) why that evidence would satisfy the specific element under the governing law. This is akin to the summary-judgment non-movant who, while having the burden, merely points to a voluminous record, assures the court that a fact issue is in there somewhere, and leaves it to the court to figure out why or how—a practice long deemed insufficient to defeat summary judgment.

*Id.* (footnotes omitted); *see Roels v. Valkenaar*, No. 03-19-00502-CV, 2020 WL 4930041, at *3 (Tex. App.—Austin Aug. 20, 2020, no pet.) (mem. op.); *Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at *19 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.); *Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 230 (Tex. App.—Austin 2018, no pet.); *Collins v. Collins*, No. 01-17-00817-CV, 2018 WL 1320841, at *5 (Tex. App.—Houston [1st Dist.] Mar. 15, 2018, pet. denied) (mem. op.); *see also Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 776 (Tex. App.—Dallas 2013, pet. denied).

The TCPA puts the burden on the party bringing the legal action to establish by clear and specific evidence a prima facie case for each essential element of his claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). The burden does not shift to the movants to refute their own motion or to this Court to search the record for responsive evidence. *See id.*; *e.g., Collins*, 2018 WL 1320841, at *5. This does not necessarily mean Hill III was required to challenge every objection raised by

appellees,[12] but absent any argument specifically addressing disputed evidence, Hill III presents nothing for this Court to review. *See* TEX. R. APP. P. 38.1(i); *e.g.*, *Stover v. ADM Milling Co.*, No. 05-17-00778, 2018 WL 6818561, at *9 (Tex. App.—Dallas Dec. 28, 2018, pet. denied) (mem. op.); *Odam v. Texans Credit Union*, No. 05-16-00077-CV, 2017 WL 3634274, at *3 (Tex. App.—Dallas Aug. 24, 2017, no pet.) (mem. op.). To put it simply, we are not willing, much less required, "to rummage through and rule on the voluminous body of objections made below that are not specifically addressed in the parties' appellate briefs." *MVS Int'l*, 545 S.W.3d at 191; *see CHW-Lattas Creek, L.P. by GP Alice Lattas Creek, L.L.C. v. City of Alice*, 565 S.W.3d 779, 792 (Tex. App.—San Antonio 2018, pet. denied). Therefore, we conclude Hill III's general complaints are insufficient to preserve any challenge to the trial court's evidentiary ruling granting appellees' objections to Hill III's evidence. *See* TEX. R. APP. P. 38.1(i).

**B. Appellees' Motion to Strike**

The other question we must address concerns a post-submission "letter" filed by Hill III, and appellees' motion to strike it.

Oral argument in this case was held on May 4, 2021, at which point the case

---

[12] In addition to maintaining that Hill III's argument is inadequately briefed, appellees also argue that many of their objections were on multiple grounds, and Hill III does not address each ground. *See, e.g., Buttler v. Sutcliffe*, No. 02-15-00319-CV, 2016 WL 4491224, at *7 (Tex. App.—Fort Worth Aug. 26, 2016, no pet.) (mem. op.) ("When a trial court issues an adverse ruling without specifying grounds for doing so, the appellant must challenge each independent ground asserted by the appellee supporting the adverse ruling because it is presumed that the trial court considered all of the asserted grounds."). Because we agree with appellees' first contention that Hill III's argument is inadequately briefed and, thus, waived, we do not address this issue.

was briefed and submitted. During oral argument, we asked counsel for Hill III what evidence not excluded by the trial court's order sustaining appellees' evidentiary objections supported Hill III's claim that he proved a prima facie case. Hill III's counsel pointed to the petition, the trial court's findings of fact from the criminal prosecution, the prior opinions of this Court, and the warranty deed and the real estate sales contract from the Bordeaux transaction. At no point did we ask counsel for any additional briefing or a follow-up response, nor did either side seek leave of court to file a post-submission brief.

But on June 7, 2021, without seeking leave of court or, according to the filing, conferring with opposing counsel, Hill III filed a 152-page post-submission "letter." This June 7 filing is a two-page letter followed by three attachments totaling 28 pages, and then 124 pages of untabbed and unindexed documents that Hill identifies, collectively, as Record Excepts. The three attachments are charts, each purporting to identify, in considerable detail, evidence in the record that satisfies Hill III's TCPA burden and that, he argues, was *not* excluded by the trial court's ruling granting appellees' objections—something he failed to do in his opening brief. They include arguments, record citations, and numerous, detailed notes and observations regarding each piece of evidence—explanatory material, again, not found in Hill III's brief. For example, an "Attachment A" (totaling 21 pages) claims to list "Specific Evidence in the Clerk's Record for every element of Appellant's claims," beginning with the malicious prosecution claim. It is a chart purporting to identify,

–39–

in detail, unexcluded evidence in the clerk's record supporting each element of Hill III's malicious prosecution claim.[13] Two additional charts in attachment A address the claims for conspiracy and aiding and abetting, and they, too, purport to list unexcluded evidence in the record supporting each claim.

The other two attachments, B and C, continue in this vein. Attachment B (totaling three pages) purports to list "Evidence in the Clerk's Record Regarding the True Nature of the Bordeaux Property Advance." Attachment C (four pages) purports to list "Specific Evidence in the Clerk's Record Supporting Appellant's Claims That Submission to the District Attorney's Office Contained Knowingly False and Misleading Statements."

On June 16, 2021, appellees moved to strike Hill III's June 7 filing. Hill III responded and then, on July 7, 2021, filed an amended response. Hill III's amended response argues, among other things, that he has not raised any new arguments or submitted new evidence in his June 7 filing, and that appellees' position "that no evidence cited in the June 7th Letter be considered by this Court 'for any purpose in determining the merits of the issues in this appeal'" is "unwarranted given that none of the evidence is new and it is indisputable that certain evidence (submitted by Appellees) was never stricken by the probate court."

---

[13] This attachment identifies the alleged evidence by categories of element 1—commencement; element 2—initiation or procurement; element 3—termination in appellant's favor; element 4—innocence; element 5—absence of probable cause; element 6—malice; and element 7—damages.

Texas law, however, is clear that any argument not raised in a pre-submission brief is waived, and that post-submission briefing raising new arguments should be excluded. *See, e.g., Tex. Med. Ass'n v. Tex. Workers Comp. Comm'n*, 137 S.W.3d 342, 351–52 (Tex. App.—Austin 2004, no pet.); *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 340 n.4 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). In *Precast*, the Fourteenth Court of Appeals said:

> In a letter brief filed over a month after oral argument, purportedly in response to a submission of supplemental authority, the City argues, for the first time, that evidence of Precast's costs to restore its property to its pre-taking condition cannot be used to measure the decrease in market value of Precast's remainder unless Precast first proves that the 'cost of cure' is less than the decrease in market value as established by some other means. Because the City failed to raise this argument in either of its pre-submission briefs, the argument is waived.

*Precast*, 60 S.W.3d at 340 n.4; *see also, Romero v. State*, 927 S.W.2d 632, 634 n.2 (Tex. 1996); *Smith v. DASS, Inc.*, 283 S.W.3d 537 n.4 (Tex. App.—Dallas 2009, app. dismd.).

Hill III's reliance on rule 9.4 of the rules of appellate procedure as support for his argument is unpersuasive because that rule addresses the form of appellate briefing, including the number of words allowed in an appellate brief. *See* TEX. R. APP. P. 9.4(i)(2). Hill III suggests his June 7 filing contains "appendix materials" that should not be counted in calculating a brief's maximum length. *Id*. 9.4(i)(1) ("In calculating the length of a document, every word and every part of the document . . . must be counted except the following: caption, identity of parties and counsel . . . certificate of compliance, and appendix."). But, as we have seen, it is more than

–41–

that—Hill III's June 7 filing contains additional analysis and argument not found in his briefs on the merits. Rule 9.4 does not authorize an appellant to re-brief his argument after the case has been submitted, particularly without seeking leave of court, and Hill III cites no relevant authority supporting such an interpretation of the rule.

Hill III's reliance on *Coleman v. Prospere*, 510 S.W.3d 516 (Tex. App.—Dallas 2014, no pet.), *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890 (Tex. 2018), and *Marino v. King*, 355 S.W.3d 629 (Tex. 2011), is equally unpersuasive. In *Coleman*, for example, we declared improper the attachment to the appellant's opening brief of an appendix of almost sixty pages containing arguments not found in the body of the brief. 510 S.W.3d at 519 n.4. As we stated in the opinion:

> We count almost sixty pages of additional argument in the appendices not including copies of various materials filed in the trial court, statutes, and cases. The brief alone is near the maximum word count, *see* TEX. R. APP. P. 9.4(i)(2)(B), although it lacks a compliant certification. *See id*. at 9.4(i)(3). We do not look outside appellant's brief for his arguments and ignore devices such as appellant has used to circumvent the briefing rules.

*Id*. In *Adams*, the Texas Supreme Court determined that arguments made by the appellant in the trial court were sufficiently stated to preserve them for appeal. 547 S.W.3d at 897 n.3. The court concluded the appellant had not failed to preserve a point for appeal regarding community or environmental well-being under the TCPA because the appellant's argument, "[w]hile lacking in specificity, . . . did mention

environmental and community well-being." *Id*. Finally, the *Marino* case, which is cited in *Adams*, addressed a trial court's ruling that allowed an appellant to amend requests for admissions that were deemed admitted by her failure to timely respond at a time when she appeared pro se in the case. 355 S.W.3d at 630, 634. The Texas Supreme Court concluded the trial court did not abuse its discretion when it granted leave to amend the responses, noting in part that "Constitutional imperatives favor the determination of cases on their merits rather than on harmless procedural defaults." *Id*. at 634.

Hill III cites this principle in his amended response. Yet there are obvious differences between a case such as this, where deemed admissions are not at issue and, moreover, both parties have been ably represented by counsel, and a situation involving a pro se litigant who mistakenly failed to respond to requests for admissions. *See id*. The equitable concerns evident in *Marino* and like cases are not present here.

The inconsistency in Hill III's argument is apparent when one compares his position in the underlying briefing to the argument in his amended response. In his amended response, Hill III claims he is "maintain[ing] his position that it is unnecessary to challenge each specific objection at the appellate level and does not attempt to do so in the June 7th Letter or in any of the attachments thereto." And, in his opening brief, Hill III did not attempt to address how, precisely, he met his burden to present a prima facie case based on evidence not excluded by the trial

court's ruling granting appellees' objections. Now, however, after oral argument has been held and the case submitted, he files a 152-page post-submission "letter" concerning that very subject, one not previously addressed in his extensive briefing. Hill III claims this lengthy post-submission filing is provided "in direct response to a question asked during oral arguments in this matter, held on May 4, 2021." In fact, however, the "letter" is a post-submission re-brief of Hill III's argument, and we again note that we did not ask for any additional briefing or a follow-up response, nor did either party seek leave of court to file a post-submission brief. We conclude, therefore, that appellees' motion to strike should be granted, and we strike Hill III's filing of June 7, 2021, and its attachments.[14]

### C. Malicious Prosecution Claim

#### 1. *Elements of Malicious Prosecution*

Turning to our step-two analysis, we begin by noting that to prevail on a claim for malicious prosecution, the plaintiff must prove (1) a criminal prosecution was commenced; (2) the defendant initiated or procured the prosecution; (3) the prosecution was terminated in the plaintiff's favor; (4) the plaintiff was innocent of the charge; (5) the defendant lacked probable cause to initiate or procure the prosecution; (6) the defendant acted with malice; and (7) the plaintiff suffered

---

[14] We additionally note that were we to consider Hill III's June 7 filing it would not, for the reasons specifically set forth below, alter our conclusion that Hill III failed to satisfy his burden of establishing a prima facie case for his claims against appellees.

damages. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 (Tex. 2006).

The tort of malicious prosecution creates a unique tension between important competing societal concerns. *See Browning-Ferris Indus. v. Lieck*, 881 S.W.2d at 288, 290 (Tex. Crim. App. 1994). More specifically, a plaintiff's right to recover damages for being subjected to unjustified criminal proceedings "must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived." *Suberu*, 216 S.W.3d at 792. Thus, a plaintiff must prove not only the defendant commenced criminal proceedings against him and that he is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward him. *Id*. The elements concerning probable cause and malice "guard against" the inclination "to punish those who, through error but not malevolence, commence criminal proceedings against a person who is ultimately exonerated." *Id*.

"It is frequently said that actions for malicious prosecution are not favored in the law." *Lieck*, 881 S.W.2d at 291. "A party seeking to recover on a malicious prosecution claim must strictly adhere to the elements of the cause of action." *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.). "Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct." *Lieck*, 881 S.W.2d at 291.

To prove causation, a plaintiff must show the defendant "initiated or procured" the criminal prosecution. *See Lieck*, 881 S.W.2d at 292–93; *Dangerfield*

*v. Ormsby*, 264 S.W.3d 904, 909–10 (Tex. App.—Fort Worth 2008, no pet.). Generally, a person cannot be held liable for malicious prosecution if the decision whether to prosecute is left to the discretion of another person, including a law enforcement official or a grand jury. *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003) (per curiam); *Lieck*, 884 S.W.2d at 294; *Dangerfield*, 264 S.W.3d at 910. An exception exists if the person provides information which he knows is false. *King*, 126 S.W.3d at 76. But while "proof a complainant has knowingly furnished false information is *necessary* for liability when the decision to prosecute is within another's discretion," "such proof is not *sufficient*." *Id*. (citing *Lieck*). There must also be proof the false information *caused* the criminal prosecution—i.e., proof "the prosecutor acted based on the false information and that *but for* such false information, the decision to prosecute would not have been made." *Id*. (emphasis added) (citing *Lieck*).

The probable cause element asks whether a reasonable person would believe a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were initiated. *Suberu*, 216 S.W.3d at 792. Want of probable cause can never be inferred from proof of malice. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 521 (Tex. 1997); *Parker v. Dallas Hunting & Fishing Club*, 463 S.W.2d 496, 500 (Tex. Civ. App.—Dallas 1971, no writ). The question is "whether the complainant reasonably believed that the elements of a crime had been committed based on the information

–46–

available to the complainant before criminal proceedings began." *Richey*, 952 S.W.2d at 519.

### 2. *Hill III Did Not Establish a Prima Facie Case for Malicious Prosecution*

Hill III alleges in his petition that his criminal prosecution was based on the February 2010 Lynn memorandum and the April 2010 Pickett submission, and the accompanying pressure Hill Jr., Lynn, and Pickett brought to bear on the D.A.'s office. Hill III's first amended petition states that "the submission of these false reports to the D.A.'s office constituted the 'initiation' of a criminal prosecution against [Hill] III," or "[a]lternatively, by submitting these false reports, [Hill Jr.], Mike Lynn, and David Pickett 'procured' criminal charges against [Hill III]. . . ."

Hill III's petition labels his "alleged ownership of only a 20% interest in the residence" as "the lynchpin of the charges" against him. According to Hill III, the defendants knew this cornerstone of the charges against him "was false." Hill III claims that statements made by Hill Jr., Lynn, and Pickett to the D.A. that Hill III and his wife owned only a 20 percent interest were false because they knew "the alleged transaction transferring an 80% interest [to the Trust] was illegal and void under Texas law" and "wholly unenforceable." Hill III also argues that Hill Jr. and Irwin (and Lynn and Pickett) knew the Bordeaux property advance was not intended to be a true sale of the Bordeaux property; knew the Trust had not been defrauded; and knew OmniAmerican had not been misled or defrauded. Hill III further alleges that, despite this knowledge, Hill Jr. met with an assistant D.A. and pressured her to

pursue a criminal prosecution of his son, and that Lynn and Pickett also pushed the D.A.'s office for indictments.

Under section 27.006, "pleadings are to be considered as evidence, regardless of whether they are offered as such." *Breakaway Practice, LLC v. Lowther*, No. 05-18-00229-CV, 2018 WL 6695544, at *2 (Tex. App.—Dallas Dec. 20, 2018, pet. denied) (mem. op.). "The TCPA allows a claimant to rely on their pleadings as 'evidence' in response to a motion to dismiss." *MFG Fin., Inc. v. Hamlin*, No. 03-19-00716-CV, 2021 WL 2231256, at *5 (Tex. App.—Austin June 3, 2021, pet. denied) (mem. op.) (quoting *In re Lipsky*, 460 S.W.3d at 590–91). But conclusory statements and bare, baseless opinions are not probative and do not meet the requirement of clear and specific evidence of a prima facie case. *In re Lipsky*, 460 S.W.3d at 592–93; *MFG Fin.,* 2021 WL 2231256, at *5; *Buckingham Senior Living*, 605 S.W.3d at 809 & n.5.[15] Hill III has not satisfied his burden.

According to Hill III's petition, his alleged ownership of a 20 percent interest in the Bordeaux residence was "the lynchpin of the charges" against him. But the July 1, 2004, general warranty deed shows Hill and his wife granted to the Trust an "eighty percent undivided interest" in the Bordeaux Avenue property. This deed

---

[15] Appellees cite a recent case from the Fourteenth Court of Appeals holding that a nonmovant cannot rely solely on his pleadings at step two. *See Buzbee v. Clear Channel Outdoor, LLC*, 616 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("We hold that, to effectuate the Act's purpose of screening unmeritorious claims, the non-movant may not rely solely on the factual allegations in his pleading but must present evidence that is sufficient as a matter of law to support a rational inference that an allegation of fact is true."). Because Hill III is not relying solely upon his pleadings here, we do not address this issue.

was signed by Hill III and his wife, and it was notarized. Moreover, litigation involving the Hills that occurred prior to the filing of this lawsuit supports appellees' interpretation of the Bordeaux transaction as having transferred an 80 percent undivided interest. The litigation had its origins in 2016 when David Pickett, as trustee,[16] filed suit against Hill III and his wife to partition and sell the Bordeaux residence through a receiver because Hill III and his wife refused to sell their interest. The district court's order of August 22, 2016, granted Pickett's motion to determine the parties' interests in the property. It stated, among other things, that the Trust had owned an undivided 80 percent interest in the Bordeaux property since July 1, 2004 (five years before Hill III obtained the home equity loan), and Hill III and his wife owned the remaining 20 percent interest.

Hill III insists the warranty deed was "wholly unenforceable;" the transaction transferring an 80 percent interest was illegal and void under Texas law; and that the Trust did not file the deed covering the 80 percent conveyance until July 2009, after the OmniAmerican Bank loan had been made. But Hill III does not identify any specific portion of the Lynn memorandum or the Pickett submission (which is not in this record) that is factually or legally incorrect. Nor does Hill III explain his basis for asserting the conveyance was unenforceable, or the transaction illegal and void.

---

[16] In 2010, Irwin resigned as the trustee and Pickett replaced him. The year before, in 2009, Irwin had sued Hill III and OmniAmerican Bank in a Dallas County district court, seeking to have the bank's lien on the Bordeaux property declared void. Although non-suited, this action was part of the litigation settled in the federal court trust action with the GSA and final judgement

Hill III's argument that the transfer of 80 percent of the Bordeaux residence was not a "real conveyance" does not show the Lynn memorandum was false. The same can be said of the Pickett submission, which, again, is not in this record. Hill III's conclusory assertions do not constitute clear and specific evidence that appellees knowingly furnished false information to the D.A.'s office.

Hill III argues, in part, that he established causation by comparing this case to *Bennett v. Grant*, 460 S.W.3d 220 (Tex. App.—Austin 2015), *aff'd in part, rev'd in part*, 525 S.W.3d 642 (Tex. 2017). *Bennett*, however, involved facts far different than those at issue here. In *Bennett*, defendant Thomas O. Bennett traveled "many miles" and met with officials in four different counties to try to get Larry Wayne Grant prosecuted. *Id*. at 240. When that effort failed, he was instrumental in obtaining the appointment of a special prosecutor, and the special prosecutor testified that he relied on the false information supplied by the defendant, which provided some evidence for the false information exception described in *Lieck*. *Id*. at 234–37, 240.[17]

This is a crucial distinction because proof that knowingly false information was provided to the Dallas D.A. alone is insufficient. *King*, 126 S.W.3d at 76. To recover for malicious prosecution when, as here, the decision to prosecute was

---

[17] The Texas Supreme Court reversed the exemplary damages portion of the court of appeals' judgment and remanded to that court for remittitur, but otherwise affirmed the court of appeals. 525 S.W.3d at 655.

within another's discretion, Hill III had to show that "but for" the allegedly false information supplied by the defendants, the decision to prosecute would not have been made. *See id.* Merely reporting a crime or aiding or cooperating with the authorities cannot "cause" a criminal prosecution. *See Lieck*, 881 S.W.2d at 292; *Dangerfield*, 264 S.W.3d at 911. Also, the Texas Supreme Court has rejected the notion that causation can be inferred from the falsity of statements, though such an inference could be drawn if the only information the official relied on in deciding to prosecute was false. *King*, 126 S.W.3d at 79; *see Gonzalez v. Grimm*, 479 S.W.3d 929, 937 (Tex. App.—El Paso 2015, no pet.); *Reed v. Cleveland*, No. 09-19-00136-CV, 2020 WL 6600968, at *6 (Tex. App.—Beaumont Nov. 12, 2020, no pet.) (mem. op.). To put it simply, "[c]ausation is an indispensable element of [a] malicious prosecution case" against a private party. *In re Bexar Co. Crim. Dist. Attorney's Office*, 224 S.W.3d 182, 185 (Tex. 2007) (former criminal defendant brought malicious prosecution action against complainants/accusers, following county's dismissal of terroristic threat charges). Furthermore, while this may be proven by a district attorney's testimony, direct evidence of causation is not required. *See id.* at 185–86. In *In re Bexar County*, the court suggested a malicious prosecution plaintiff might prove their case through alternative means, including circumstantial evidence, testimony from the defendant, or expert testimony. *Id*. at 189. Even, so, however, the court never suggested the decision-making process of the district attorney was not a necessary component of the plaintiff's case. *Gonzalez*, 479 S.W.3d at 936.

Hill III pleads that the D.A.'s office presented the case to the grand jury only after succumbing to pressure brought by others acting on Hill Jr.'s behalf, including Lynn and Pickett. Yet, it is undisputed that the ultimate decision to indict was made by a Dallas County grand jury. According to the timeline in Hill's petition, the case was presented to the grand jury on March 29, 2011—thirteen months after Lynn submitted his memorandum and eleven months after Pickett made his written submission. We do not know what information was or was not presented to the grand jury, nor why it decided to indict Hill III. And, during those intervening months, we know little about Watkins's decision-making process regarding the Hill III case. We know he attended an office "pitch session" where the decision to indict was made, but we do not know what was specifically discussed or what questions Watkins may have asked. We do not know if he personally directed an investigation of Hill III or if he influenced the timing of the presentation of the case to the grand jury. Nor do we know the extent to which Watkins relied on the Lynn and/or Pickett submissions in deciding to pursue an indictment; when he reviewed them; or whether Pickett's follow-up conversations with the D.A.'s office caused or influenced the D.A. to indict the Hills months later. Hill III's assertions regarding the timing of certain telephone calls and text messages, or campaign donations and charitable contributions and fundraisers, does not constitute *clear and specific evidence* that "but for" the false information appellees allegedly supplied, the decision to prosecute Hill III would not have been made.

As for Irwin, he resigned as trustee of the Trust in April 2010, less than two months after Lynn's memorandum was submitted to the D.A.'s office. Hill III does not allege, much less provide clear and specific evidence, that Irwin had any connection to the Trust after he resigned as trustee, or that Irwin even knew about— much less participated in—the criminal proceedings against Hill III. There is also no clear and specific evidence he knowingly provided false information to the D.A.'s office. Nor is there clear and specific evidence Irwin submitted false information to the Dallas D.A. that was the determining factor in the D.A.'s decision to seek indictments. Hill III's vague and conclusory allegations lumping Irwin together with numerous other individuals identified in his petition are insufficient to satisfy the standard required under the TCPA.

Regarding the trial court's findings in the criminal case, in his post-submission filing of June 7, 2021, in the portion of attachment A addressing procurement and purportedly listing "[e]vidence false statements submitted to the DA's office were relied on," Hill III cites the trial court's finding of fact that "the State relied extensively on materials submitted by Mr. Hill, Jr. and his attorney." He next cites a statement in the State's response to his motion to quash and dismiss that "the complaint Mike Lynn presented to the Dallas County District Attorney's Office provided probable cause to believe that both Erin and Albert Hill have broken the law." In that same June 7 filing, under "[e]vidence of absence of probable cause," Hill III points to a statement from the trial court's conclusions of law that "[t]he

Court concludes that the State has failed to provide a credible, neutral explanation for the State's decision to prosecute that is untainted by Mr. Watkins's involvement[.]" He also refers to our majority opinion on remand in the criminal case, specifically the part where we discuss Martin's inconsistent testimony about whether she thought she had a provable criminal case against Hill III.[18]

Hill III, however, cannot satisfy his burden by citing the trial court's findings in the criminal case. In our opinion on remand in the criminal case, we specifically noted that the trial court's August 2, 2013 "Findings of Facts and Conclusions of Law on Albert G. Hill's Motion to Quash and Dismiss the Indictments" were "null and void." *State v. Hill, III*, 558 S.W.3d at 288 n.1. Because they were made after the trial court's jurisdiction had expired, they could not be considered. *Id.*; *see Berry v. State*, 995 S.W.2d 699, 700 (Tex. Crim. App. 1999); *see also Green v. State*, 906 S.W.2d 937, 939 (Tex. Crim. App. 1995) (it is axiomatic that where there is no jurisdiction "the power of the court to act is as absent as if it [the court] did not exist."). Moreover, none of the appellees were parties to the criminal proceedings. *See Owen v. De Los Santos*, No. 04-06-00899-CV, 2008 WL 726165, at *3 (Tex. App.—San Antonio Mar. 19, 2008, no pet.) (mem. op.) (findings of fact and

---

[18] Hill III's other basis for clear and specific evidence is his declarations. In his brief, he cites to paragraphs from his declaration that contain allegations regarding the Lynn and Pickett submissions that are like the allegations found in his petition. His declaration states, inter alia, that in deciding to prosecute him, the D.A.'s office relied on the Lynn and Pickett submissions; that these submissions falsely stated the Trust had been defrauded; and that they falsely stated Hill III and his wife only owned a 20 percent interest in the residence. However, as we noted before, the trial court granted appellees' objections to these and many other paragraphs in Hill III's declarations, and Hill III inadequately briefed the issue on appeal; thus, we do not consider Hill III's declarations. *See* TEX. R. APP. P. 38.1(i).

conclusions of law, standing alone, were "suppositions" that could not bind non-parties to judgment in case to which they were not parties).

Additionally, Hill III's argument incorrectly assumes this Court and the Texas Court of Criminal Appeals "passed judgment" on the wrongful nature of the conduct alleged in the petition. But neither this Court nor the Court of Criminal Appeals addressed, for example, whether Hill III was innocent or guilty of the underlying charges; whether those charges were false or without factual or legal merit; whether the Lynn memorandum or the Pickett submission was true or false; nor whether there was any wrongdoing or "wrongful" conduct by Lynn or Pickett. The issue was whether the trial court abused its discretion in dismissing the criminal complaint against Hill III with prejudice—more specifically, because of the refusal of D.A. Watkins to testify at the hearing. As we stated in our opinion on remand:

> At the conclusion of the hearing, the court granted Hill's motion and dismissed the cases with prejudice. The court's order recites that Hill had been denied his right to a full and fair hearing on his motion due to Watkins's refusal to testify at the hearing. The court determined the district attorney's office denied Hill his due process rights under the United States and Texas constitutions.

*See State v. Hill, III*, 558 S.W.3d at 283; *see also* 499 S.W.3d at 869. The dismissal of the charges against Hill III on procedural grounds is not evidence he was unjustifiably subjected to criminal proceedings. *See, e.g.*, *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 794–95 (Tex. 2006) ("Her acquittal is not evidence, then, that she was unjustifiably subjected to criminal proceedings; it shows only that the government did not prove her guilt beyond a reasonable doubt."); *Buckingham*

–55–

*Senior Living,* 605 S.W.3d at 811 ("The dismissal of criminal charges is no evidence that George lacked probable cause at the time she assisted in reporting the offense."); *Metzger v. Sebek*, 892 S.W.2d 20, 42 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("[e]ven an acquittal is not evidence of a lack of probable cause").

Nor can Hill III satisfy his burden by citing a statement in the State's response to his motion to quash and dismiss that the complaint Lynn presented provided probable cause to believe the Hills had broken the law. Hill III cites the statement as evidence that false statements submitted to the D.A.'s office "were relied on." However, it, too, falls far short of even showing appellees knowingly supplied false information to the D.A.'s office, much less that "but for" the false information they allegedly supplied, the decision to prosecute Hill III would not have been made.

In addition to proving appellees initiated or procured the prosecution, Hill III also had to prove, among other things, that the defendants lacked probable cause. *See Suberu*, 216 S.W.3d at 792. A presumption exists that a "defendant acted reasonably and had probable cause to initiate criminal proceedings." *Id*. at 793. To rebut this presumption, Hill III had to produce prima facie evidence appellees initiated or procured his prosecution based on information or motives that do not support a reasonable belief Hill was guilty of the charged offense. *Id*. at 792. Hill III, however, also fails to produce clear and specific evidence to show a prima facie case for this element. The dismissal of the criminal charges against him does not prove appellees lacked probable cause, just as Hill III's indictment did not prove his

guilt. *See Suberu*, 216 S.W.3d at 794. As we noted before, the probable cause element cannot be met by evidence of a subsequent resolution of the criminal charges in Hill III's favor. *E.g., Suberu*, 216 S.W.3d at 794–95; *Buckingham Senior Living*, 605 S.W.3d at 811; *Metzger*, 892 S.W.2d at 42.

We therefore conclude Hill III failed to meet his burden of establishing a prima facie case for each essential element of his malicious prosecution claim. There is no clear and specific evidence appellees knowingly furnished false information to the D.A.'s office, and even if we assume appellees knowingly supplied false information, there is no clear and specific evidence that "but for" the false information allegedly supplied by appellees, the decision to prosecute Hill III would not have been made. We further conclude there is no clear and specific evidence to support the probable cause element of a malicious prosecution claim.

### D. Conspiracy and Aiding and Abetting Claims

Turning to Hill III's dependent or derivative claims for civil conspiracy and aiding and abetting, Hill III failed to present prima facie evidence on these claims as well because he did not present prima facie proof to establish that appellees participated in an underlying, intentional tort. *E.g.*, *Castille*, 2020 WL 1879475, at *6; *W. Fork Advisors, LLC*, 437 S.W.3d at 921. Accordingly, the trial court did not err when it dismissed Hill III's claims for civil conspiracy and aiding and abetting. Furthermore, because Hill failed to establish a prima facie case for each essential element of his claims, we do not address his third issue, in which he argues appellees

failed to meet their burden to establish each essential element of any valid defenses. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c); TEX. R. APP. P. 47.1; *Castille*, 2020 WL 1879475, at *7. We overrule Hill III's second issue.

## V. Conclusion

We overrule Hill III's first two issues and conclude the trial court did not err in granting appellees' TCPA motions to dismiss. We grant appellees' motion to strike Hill III's post-submission filing of June 7, 2021.[19] We do not address Hill III's third issue. The trial court's order and final judgment is affirmed.

200644f.p05

/Lana Myers//
LANA MYERS
JUSTICE

---

[19] On October 26, 2020, less than two months after Hill III filed his opening brief in this case, he and his wife filed a complaint in federal court against Craig Watkins, the Hill Jr. estate, and various other defendants. The complaint was filed in the Northern District of Texas and alleged various federal claims, and, according to appellees, it contained the same factual allegations as the instant case. The Hill Jr. estate filed a rule 12(b)(6) motion to dismiss, and Hill III and his wife subsequently filed a notice of voluntary dismissal. Appellees filed a motion asking us to take judicial notice of the complaint filed in this federal suit, the rule 12(b)(6) motion, and the notice of voluntary dismissal—to which Hill III responded in opposition. Because we conclude, based on the record before us, that the trial court did not err in granting the TCPA motions to dismiss, we do not address this issue. We therefore deny the motion for judicial notice.

–58–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ALBERT G. HILL, III, Appellant

No. 05-20-00644-CV        V.

MARGARET KELIHER, IN HER
CAPACITY AS PERSONAL
REPRESENTATIVE AND
SUCCESSOR INDEPENDENT
EXECUTOR OF THE ESTATE OF
ALBERT G. HILL, JR., AND
CAROL E. IRWIN, IN HER
CAPACITY AS PERSONAL
REPRESENTATIVE OF THE
ESTATE OF IVAN IRWIN.JR.,
Appellees

On Appeal from the Probate Court
No. 2, Dallas County, Texas
Trial Court Cause No. PR-19-02706-2.
Opinion delivered by Justice Myers.
Justices Partida-Kipness and Garcia
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.  It is **ORDERED** that appellee MARGARET KELIHER, IN HER CAPACITY AS PERSONAL REPRESENTATIVE AND SUCCESSOR INDEPENDENT EXECUTOR OF THE ESTATE OF ALBERT G. HILL, JR., AND CAROL E. IRWIN, IN HER CAPACITY AS PERSONAL REPRESENTATIVE AND INDEPENDENT EXECUTOR OF THE ESTATE OF

IVAN IRWIN, JR., recover their costs of this appeal from appellant ALBERT G.

HILL, III.

Judgment entered this 25th day of January, 2022.